**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **JEANEA M. THIBODEAUX** | § | **CIVIL ACTION NO:** _____ |
| | § | |
| | § | |
| *Plaintiff* | § | |
| **VERSUS** | § | |
| | § | |
| | § | |
| | § | |
| **PORT AGGREGATES, INC.** | § | |
| | § | |
| *Defendant* | § | **JURY DEMAND HEREIN** |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

**NOW COMES** Plaintiff, **JEANEA M. THIBODEAUX,** through undersigned counsel, who hereby files her Original Complaint against Defendant, **PORT AGGREGATES, INC.** She hereby states as follows:

---

### JURISDICTION AND VENUE

---

1. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 as it appears at 42 U.S.C. § 2000e *et seq.*

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

   b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government;

3.  It is a jurisdictional requirement of this Court that the Plaintiff has filed a charge with the Equal Employment Opportunity Commission (EEOC) prior to instituting action.  Plaintiff met this requirement by filing her EEOC charge on or about June 7, 2018. (Charge No. 461-2018-01409). *See* Exhibit A.

4.  The EEOC mailed Plaintiff her Notice of Suit Rights on February 7, 2019. *See* Exhibit B. Plaintiff is afforded 90 days from her receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

5.  Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in Calcasieu Parish, making the Lake Charles Division the most appropriate Division for this suit.

---

## PARTIES

---

6.  Plaintiff is a citizen of the United States and resides in the city of Sulphur, Parish of Calcasieu, State of Louisiana, which is in this judicial district.

7.  Plaintiff is a female and, as such, is a member of a protected class.

8.  From the ages of four (4) through thirteen (13), a family member touched Plaintiff inappropriately on a consistent basis.

9.  At all times relevant to this suit, Plaintiff worked as a Human Resources and Safety Manager and/or Human Resources Manager.

10. Defendant, **PORT AGGREGATES, INC. ("PAI")**, is a corporation organized and existing under the domestic laws of the State of Louisiana. Its principal place of business in located in the City of Lake Charles, State of Louisiana.

## FACTUAL ALLEGATIONS

11. Plaintiff began her employment with Port Aggregates, Inc. on October 18, 2010. Plaintiff was originally employed as the company's Human Resources Manager and Safety Manager, earning an annual salary of $36,000.00.

12. Throughout her employment, and as a direct result of her exemplary performance, Plaintiff received several pay raises. At all times relevant to this suit, Plaintiff earned a yearly salary of $65,000.00, made effective on October 11, 2017.

13. At the time of Plaintiff's hire, Holly Guinn Durkes ("Holly G.") served as the PAI office manager. At this time, Plaintiff and Holly G. were considered "equals" with the executive hierarchy. Both women reported directly to the then-owner, Andrew Guinn, Sr.

14. Andrew Guinn, Sr., gave Plaintiff purchasing authority for any purchase order under $3,000.00, if such expense pertained to any of Plaintiff's departments.

15. At the time of Plaintiff's hire, PAI remained a relatively small company, which was comprised of approximately sixty-five (65) employees, spread among three (3) subsidiaries.

16. In approximately June 2012, Plaintiff was informed that PAI was hiring approximately two-hundred (200) additional employees in conjunction with an acquisition that PAI had

just entered. This was the acquisition of Angelle Concrete, which will hereinafter be referred to as the "Angelle Roll-over."

17. On approximately August 20, 2012, Jamie Angelle ("Angelle") was hired by Port Aggregates, Inc. as the "Division Manager, East Region" as part of the Angelle Roll-over all times relevant to this suit, Angelle served as the Division Manager of the East Region and/or Ready Mix Division General Manager.

18. Prior to his employment by PAI, Angelle worked as salesman for Angelle Concrete. As part of the Angelle Rollover, PAI acquired the assets of Angelle Concrete and hired Angelle as PAI's "Division Manager, East Region." Upon information and belief, Angelle's job title was altered, pre-rollover, to reflect him at a higher position than the salesman capacity in which he actually worked.

19. In Angelle's position as Division Manager, Angelle was in a significantly inferior position to Plaintiff, both in terms of authority and job responsibilities. While Angelle managed a fraction of one (1) of the four (4) PAI subsidiaries, Plaintiff was tasked with overseeing the human resources, risk management, case management, legal management (including workers' compensation and any type of commercial litigation), training, payroll, employee relations, and liaison work for PAI main office, all of its subsidiaries, and several of PAI management officials.

20. In 2016, Angelle began overseeing the Lake Charles (West Region) and Lafayette (East Region) Divisions on a temporary basis due to a job opening. At that point, Adam Guinn placed Angelle over the entire Ready Mix Division such that Angelle and Plaintiff held positions with nearly identical administrative and managerial authority, despite the fact

that Angelle was only over Ready Mix, whereas Plaintiff oversaw the company and all of its subsidiaries.

21. On almost a daily basis, Angelle circulated rumors about Plaintiff's relationships with fellow employees, accusing her of "sleeping with" or "fucking" numerous male employees. He constantly asked Christopher Gotreaux, Joey Smith, Juan Garcia, "who is Jeanea fucking?" or "who is Jeanea sleeping with?" This occurred on numerous occasions throughout 2016 and 2017, at multiple meetings, luncheons, and company events.

22. On several occasions, Angelle would refer to Plaintiff as "vajeanna" when responding to Plaintiff, both in person and through text messages.

23. In December 2015, Angelle directed a text to Plaintiff regarding vaginal mesh lawsuits. Plaintiff had liked an attorney's page on Facebook, and Angelle took it upon himself to send Plaintiff a picture of a post that attorney had shared and say…. "why do you keep liking vaginal mesh lawsuits…. weird."

24. Angelle's sexual comments directed to or otherwise directed at Plaintiff were so pervasive and offensive that she was reduced to tears, oftentimes experiencing significant anxiety when forced to collaborate with Angelle on business processes. Angelle's persistent use of sexually derogatory comments toward Plaintiff greatly inhibited their working relationship, and the ongoing conflict between Angelle and Plaintiff was well known and observed by PAI management consistently throughout their employment together.

25. At one point mid-2017, Angelle stopped the Human Resources department from using a particular contract labor staffing company because Angelle thought Plaintiff and the

company's owner, Juan Garcia, had been sleeping together. On numerous occasions, Plaintiff had informed Angelle that his belief was entirely unfounded and untrue.

26. Despite the fact that the decision to utilize certain companies was a Human Resources function and therefore entirely outside of Angelle's purview, he nevertheless circumvented protocol and procedure to effectuate this change. Angelle merely contacted his operations manager and instructed him not to use that company or its drivers any more.

27. Any time Plaintiff attempted to report her concerns to Holly Guinn Durkes ("Holly G.") or Adam Guinn, or ask that she be allowed to speak to their father and her former boss, Andrew Guinn, Sr., they repeatedly threatened her, saying, "you better not" or "you better f****** not."  Then, either Holly G. and/or Adam Guinn would inform Plaintiff that Andrew Guinn, Sr. "already knows" about "everything" and that "he agrees with and supports everything" they are doing.

28. Despite the fact that Defendant claims to have an "open door policy," after Plaintiff was subjected to the consistent threats of Holly G. and/or Adam Guinn, she feared that, if she spoke up to Andrew Guinn, Sr., that she would be terminated immediately. Plaintiff firmly believed that Andrew Guinn, Sr., was completely unaware of the severity of the workplace discrimination; however, Plaintiff feared that, if she contacted him against the advice of Holly G. and/or Adam Guinn, that she would lose her job.

29. Jamie Angelle oftentimes traveled from Breaux Bridge to Lake Charles. When he did so, Defendant oftentimes permitted Angelle to stay at L'Auberge at the company's expense. In contrast, when Plaintiff would travel out of town with employees for training purposes

or otherwise perform her regular duties, she was required to drive all the way home the same day because the company refused to pay for her overnight visits.

30. Plaintiff was required to remain "on-call" twenty-four (24) hours per day, seven (7) days per week, even if Plaintiff was on vacation.

31. The continuous racial slurs and derogatory comments made toward and about African American employees and customers severely offended Plaintiff. Any time Plaintiff heard Holly or Brad degrading African Americans, she told them to stop, and that their continuous, daily commentary, was illegal. Brad simply commented that he "thinks it's funny."

32. On numerous, continuous occasions, Holly G. Durkes and/or Brad Durkes referred to African American individuals as "Niggers." These individuals include, but are not limited to, company drivers, customers, and employees involved in accidents with the company that subsequently file suit.

33. Both Holly G. and Brad Durkes would refer to themselves as "sweating like slaves" if they were performing their job duties. Additionally, when Brad Durkes would call Holly G. (his wife) while at work, Holly G. would comment, "aww, look at my husband working like a n*****."

34. On numerous occasions, both Holly G. and Brad Durkes spoke about how only African Americans were on food stamps.

35. In one instance, and without asking the identity of the individual filing suit, Brad Durkes stated, "everyone we are in lawsuits with is a Nigger" and assumed that it was an African American bringing suit because they "want quick money."

36. When Plaintiff expressed her concern with the pervasive racial slurs used in the workplace, Adam Guinn replied, "these people are old school, from the south and you are not going to change them. That's how they were raised, Jeanea, it's the South's way of thinking."

37. On January 11, 2017, several employees traveled to New Orleans for the Annual Boulder Risk Meeting. When Chris Gotreaux bought Plaintiff a beer when the staff met at a bar on Bourbon Street, Angelle stated to Chris Gotreaux, "you're fucking her, aren't you? I know you're fucking her."

38. On March 22, 2017, Plaintiff attempted to address her concerns directly to Jamie Angelle, telling him that his repeated references to her personal life and who she was sleeping with was entirely inappropriate, unprofessional, and severely impacting her ability to work with him in a collaborative manner. Angelle simply disregarded Plaintiff's plea that he refrain from speaking to her and about her in a sexually derogatory manner.

39. Consistently after March 2017 and Plaintiff's requests to Angelle himself proved futile, Plaintiff submitted a verbal complaint directly to Adam Guinn regarding what she reasonably believed to constitute sexual harassment in the workplace. Plaintiff's requests that Adam Guinn speak to Angelle about the matter were constantly met with Guinn's assertions that he was "too busy" and would "talk to him when he has time."

40. Despite Plaintiff's request that Angelle stop the discriminatory behavior, the behavior persisted, and he continued to discuss inappropriate aspects of Plaintiff's personal life to numerous employees and on numerous occasions.

41. On April 26, 2017, Plaintiff informed Holly G. and Adam Guinn that she had attempted to address her concerns directly with Angelle due to Guinn's incessant delay in speaking with Angelle to remedy Plaintiff's concerns.

42. On May 12, 2017, the company attended the 2017 CAAL Ready Mix Driver Competition in Opelousas, Louisiana. When discussing hotel arrangements, Angelle stated to Chris Gotreaux, "I don't know why I am getting you your own room when I already know whose room you are going to be in by the end of the night." When Chris Gotreaux asked, "who?" Angelle replied, "just admit it Chris, you know you're fucking Jeanea, you know you're fucking her."

43. On August 10, 2017, Plaintiff had scheduled a meeting with Adam Guinn in order to discuss whether Adam had spoken with Jamie Angelle about the verbal complaint Plaintiff had lodged regarding sexual harassment, harassment, and a hostile work environment. Adam Guinn responded that he had not spoken to Angelle because he did not have time. Rather, Guinn stated, "Jeanea, at the end of the day, you and Jamie Angelle have to learn how to get along, Jeanea we have had this conversation before."

44. On August 12, 2017, while several employees were loading up equipment after a Plan Manager Plan Forum, Angelle asked Chris Gotreaux, in the presence of several other employees, "don't lie, you know you bringing that shit to her house, cause you know you fucking her." All of the employees started laughing, and Chris Gotreaux clarified, yet again, that he and Plaintiff are not sleeping together.

45. On September 11, 2017, during an insurance renewal meeting, Plaintiff asked Adam Guinn whether he had spoken to or otherwise addressed her report of sexual harassment/harassment against Jamie Angelle. In response, Adam Guinn stated, "what do

you want me to do to him, Jeanea?" Plaintiff responded, "talk to him like you said you were going to do a long time ago. Do an investigation like you said you were going to do a long time ago, Adam?" Plaintiff reiterated that Angelle had actively harassed her and attempted to ruin her reputation and working relationship with other managers, and that she cannot tolerate his behavior any longer.  She informed Adam Guinn that it had gotten to the point where she felt embarrassed to come to work in fear of what Angelle had said or asked about her personal life.

46. On or about September 14, 2017, Jamie Angelle filed a complaint against the Human Resources and Safety Department (which particularly included Plaintiff, Amy Taylor, and James "Buddy" Fountain), vaguely asserting and implying that they had collectively violated the company's Ethical Standards. Angelle specifically omitted several members of the Human Resources and Safety Department from the complaint.

47. At no time has Plaintiff been afforded an opportunity to respond, either formally or informally, to the allegations lodged against the Safety and Human Resources Department by Jamie Angelle. Rather, Defendant's management took Angelle's vague assertions as true, all without performing any semblance of an investigation into the allegations.

48. On September 14, 2017, during a phone call with Adam Guinn, Plaintiff asked him whether he had addressed the sexual harassment, harassment, and/or hostile work environment issues Plaintiff had reported about Jamie Angelle. In response, Adam Guinn stated that he had not spoken to Jamie Angelle yet because he had "so much going on" and that he would "talk to Jamie when [he has] time."

49. On September 18, 2017, Adam Guinn scheduled a Group Safety Interview meeting with Plaintiff, Amy Taylor, James "Buddy" Fountain, and Michael Trahan. During the meeting, Adam stated that changes were going to be taken regarding the Safety and Human Resources Departments. While Michael Trahan and James "Buddy" Fountain were to remain in the Safety department, Adam informed Plaintiff that she and Amy Taylor (female) would remain solely in the Human Resources department moving forward. Adam explained that Plaintiff and Amy Taylor were being moved to Human Resources because they are "women in a man's world." Furthermore, Adam stated that he would be hiring a man to fulfill the Safety Manager position because "a man will be taken more seriously in the field."

50. On October 10, 2017, Adam Guinn informed Plaintiff that she was being changed to a strictly Human Resources position, and he instructed her to report directly to Holly G., rather than to himself as she had done historically. During the conversation, Plaintiff expressed her concern that she was being retaliated against due to her reporting Jamie Angelle for purported sexual harassment. She relayed to Plaintiff how "dirty" Jamie Angelle is, and reported how employees are terrified of Jamie Angelle in fear of losing their jobs. In response, Adam Guinn noted that Jamie had done "leaps and bounds for the company financials."

51. In response to Plaintiff's concerns, Adam Guinn reiterated to Plaintiff that she needed to learn how to get along with Angelle.

52. During the conversation, Plaintiff reiterated that Jamie Angelle is untouchable. Plaintiff noted that a Puerto Rican employee, Saul Velasquez, wanted to file a complaint James Stansbury, a direct report to Jamie Angelle, for calling him a "wetback," however, after

speaking with Jamie Angelle in Angelle's office, Saul decided against filing a complaint because he had just purchased a house in Lafayette and needed the job.

53. Concerned that Angelle was interfering with Mr. Velasquez's attempt to report discrimination to Human Resources, Plaintiff contacted Adam Guinn. In response, Guinn told her to "leave it alone."  Further, when Plaintiff requested that Adam Guinn obtain written notice from the employee that he had voluntarily opted to not file a complaint, Plaintiff received no return correspondence whatsoever.

54. During the conversation, Adam Guinn acknowledged that Plaintiff had come to him several times regarding Jamie Angelle. Plaintiff again stated that, even when she tried to address Jamie about the issues herself, he kept asking her, "who are you sleeping with you? Who are you fucking?" In response, Adam Guinn stated that, "women in the field around drivers and all these men was never a good idea" and that a woman's place "was better in the office." He then stated, "these things are going to happen because you're a woman in a man's world." He stated that he was placing her in a "non-confrontational role."

55. Immediately following her meeting with Adam Guinn, Plaintiff suffered a panic attack and severe anxiety attack. She sought medical treatment from Dr. Kevin Schlamp, presenting to a medical provider, for the first time, that she had experienced an anxiety attack.

56. On October 11, 2017, Plaintiff spoke with Holly G. via phone regarding the changes Adam Guinn, Andrew Guinn, Sr., and herself (Holly) decided in regards to the complaint Jamie Angelle filed. When Plaintiff stated that she needed to speak with Andrew Guinn Sr. regarding the unaddressed harassment and sexual harassment complaints, Holly G.

stated, "you better not. Dad (Andrew Guinn, Sr.) knows about everything going on." Further, Holly G. stated, "if you don't like the way things are going and you are becoming ill/stressed, you sound like you need to go and find another job. You are just going to have to learn how to work with Jamie Angelle and deal with him and the situation if you want to stay here."

57. In October 2017, Adam Guinn informed Plaintiff via phone call that she would be receiving a "little bump" because the New Safety Manager, Michael Lietz, who was taking her previous duties as part of the demotion, would be walking in at $65,000.00 per year. Guinn stated, "I can't very well bring him in at more than you and you have always had 5 times more responsibilities." He then laughed and stated, "at lease we are not taking any money from you."

58. In approximately November 2017, a male employee was caught misappropriating Plaintiff's signature block on a "legal" document without her knowledge or permission. When Plaintiff discovered the misconduct and reported to Holly G., no corrective action was taken. When Holly G. refused to take action, Plaintiff approached Adam Guinn, and no corrective action was taken.

59. Ultimately, Holly G. verbally berated Plaintiff for "going behind her back." Both Holly G. and Adam Guinn refused to take any action against the individual who had acted fraudulently.

60. On December 2, 2017, while at the Lake Charles Mechanic Shop, several employees gathered to throw a retirement party for Bernie Morrison. While walking out to her truck, Brad started discussing a couple of different accident and other business-related issues, at which time Brad Durkes asked, "what are they? Figure they probably Niggers." Plaintiff

immediately responded, stating, "Brad, you cannot say stuff like that." In response, Brad stated, "It's true, just like if my skin was a little darker I could get away with not paying my child support."

61. Holly G. and Brad Durkes adopted a bi-racial child. Upon doing so, Holly G. stated that they wanted a "N***** baby" because it was cheaper.

62. On January 15, 2018, during a meeting, Brad Durkes made the comment to the group, while laughing, about his skin not being "dark enough" in color, referring to Bobby Gradney, an African American male who was also present at the meeting. Brad and Emily Durkes began laughing; however, Mr. Gradney and Plaintiff did not. Upset by the comment, Plaintiff dismissed herself from the meeting and refused to return.

63. On January 17, 2018, Plaintiff suffered an injury to her left knee while participating on a work call pertaining to a PAI worker's compensation matter.

64. On the following day, January 18, 2018, Plaintiff assisted the PAI courier with her route, at which time she began experiencing significant pain in her left knee.

65. Thereafter, while walking through the airport on a company trip, Plaintiff's knee pain worsened, causing her to place a brace on her knee.

66. In early February 2018, Plaintiff presented to the office of Dr. Steven Hale, MD, at which time she was informed that she had fractured her knee in two (2) places and suffered significant damage. Plaintiff was reduced to a brace and crutches, and she was precluded from bearing any weight on it.

67. After repeatedly reporting her concerns and finding no remedial action taken by PAI management, Plaintiff had no choice but to file a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. Plaintiff submitted her intake

questionnaire to the EEOC on or about March 12, 2018, and she later signed her formal Charge document (Charge No. 461-2018-01409) on May 15, 2018. *See* Exhibit A.

68. Plaintiff contacted Holly G. and informed her of the doctor's orders. At that time, Plaintiff asked Holly G. whether she needed to take medical leave. Holly G. stated that she would need to speak to Adam Guinn and see whether Plaintiff could perform her administrative job duties remotely. At no time did Holly G. respond to Plaintiff's inquiry.

69. Plaintiff utilized the crutches and brace for several weeks; however, Plaintiff was not showing any progress. Plaintiff ended up working from home continuously thereafter.

70. In April 2018, Plaintiff fell while participating in a work call and exacerbated the condition of her knee injury. As such, Plaintiff continued working from home long-term. From early February 2017 through February 7, 2019, Plaintiff performed her job duties exclusively from home.

71. On April 30, 2018, Adam Guinn asked Jonah Begnaud to begin posting and advertising job ads. This duty had belonged exclusively to Plaintiff for the duration of her employment with Defendant; however, Guinn, without notifying Plaintiff, assigned the task to an Environmental and Marketing employee that had never run Job Ads prior. Furthermore, at no time did Adam Guinn inform Plaintiff that advertising was needed at the time.

72. On numerous occasions, Plaintiff would direct emails to Adam Guinn and/or Holly G. to approve certain forms or address certain questions so that she could satisfactorily perform her job duties. On numerous occasions, Adam Guinn and/or Holly G. would refuse to respond. Thereafter, on numerous occasions, Adam Guinn and/or Holly G. would speak to Plaintiff about her job duties not being completed.

73. On or about May 1, 2018, Defendant posted a job offering for the company HR Recruiter/Generalist position on Indeed.  Defendant's renamed Plaintiff's position and advertised it under a different tile with the hopes that Plaintiff would not notice. Defendant did not release its identity in the job posting, and the advertisement indicated that a "Local Company" in "Jennings, LA" had generated the advertisement.

74. On May 2, 2018, when Holly Guinn became aware that Plaintiff did not want to be involved with the company's defense of the Charge of Discrimination filed by Amy Taylor, Guinn began screaming at Plaintiff and thereafter hung up on Plaintiff.

75. Despite Plaintiff's repeated requests to be kept out of the investigation into Amy Taylor's Charge, Defendant's employees continuously included Plaintiff in e-mail correspondence regarding the investigation and case.

76. Furthermore, on May 2, 2018, Plaintiff forwarded a copy of the Charge of Discrimination directly to Holly G. As such, Holly G. had notice of Plaintiff's charge by May 2, 2018.

77. On May 3, 2018, Plaintiff specifically informed Adam Guinn that she did not want to be involved with the Charge of Discrimination filed against the company by Amy Taylor. During the conversation, Plaintiff stated that she felt that it would be a conflict of interest for her to represent the company on Amy Taylor's charge. Additionally, Plaintiff stated that "her attorney" could send Adam Guinn a letter of representation to assuage any of his concerns. Plaintiff also informed Adam Guinn of Holly Guinn verbally berating her and hanging up on her the day prior.

78. On May 7, 2018, Defendant's organizational chart was updated and approved, demoting Plaintiff from Executive Management and completely removing the Safety Department from her purview.

79. All email delivery and read receipts have been turned off so that, when Plaintiff directs emails to Andrew Guinn, Sr., Adam Guinn, Holly Guinn Durkes and/or Brad Durkes, Upon information and belief, Plaintiff can no longer see if and when these emails are received. This has impaired Plaintiff from performing her job duties.

80. On May 16, 2018, Plaintiff became aware that her previous duties involving correspondence with Josh Briggs, Risk Control personnel, had been revoked and otherwise assigned to Mike Trahan. Plaintiff raised her concerns about being left off correspondence to both Adam Guinn and Holly G. Durkes; however, she never received a response from either one.

81. Prior to Defendant's receipt of Plaintiff's Charge of Discrimination, she had remained responsible for the company's Risk Management functions.

82. On or about June 5, 2018, Defendant revoked Plaintiff's authority to approve her department's time off requests, all without any notification thereof or justification provided therefor.

83. As part of Plaintiff's "work-from-home" arrangements, the Office Carrier, Dixie Langley, was required to pass by Plaintiff's house as often as necessary to pick up and drop off normal workday paperwork so that Plaintiff could continue to complete her assigned job duties. In the email dated June 6, 2018, Holly G. Durkes provided that "all files are to remain on Port Aggregates property" such that Plaintiff would no longer be able to perform her job duties remotely. When Plaintiff had required "work-from-home" accommodations previously in 2013 and 2014, she was permitted to take any and all paperwork home.

84. Ultimately, Plaintiff was required to perform various job duties, including, but not limited, to part-time disability claims processing. After Defendant removed her company property, Plaintiff was expected to perform her job duties without the use of a printer and several other items critical to the performance of office job functions. Instead, Plaintiff had to walk another member of the Human Resources assistant through various forms over the phone, which took substantially more than time it would have taken Plaintiff to complete the forms, had she had continued use of a printer and other basic office utilities.

85. As a result of the email, Plaintiff began experiencing a panic and anxiety attack Plaintiff reported to St. Patrick's Hospital in Lake Charles, and she was kept overnight for additional observation.

86. On June 13, 2018, Adam Guinn contacted Nicole Veronie and James "Buddy" Fountain for a Safety Job Description. Plaintiff had been charged with submitting Job Descriptions throughout her extensive employment with Defendant; however, without any notice thereof or justification therefore, Adam Guinn began siphoning Plaintiff's HR job duties to other employees so as to circumvent her authority.  Both Ms. Veronie and Mr. Fountain called and asked Plaintiff for guidance and assistance, and neither one of them had any prior experience with handling job descriptions.

87. Plaintiff directed an email to Adam Guinn stating that it would be far more efficient if he continued to request job description information from her, rather than from subordinate employees; however, Guinn did not respond to Plaintiff's email and continued to contact other employees to acquire information maintained and generally supplied by Plaintiff.

88. On June 22, 2018, Plaintiff received a notification that Holly G. Durkes had just accepted a calendar invite Plaintiff had scheduled back in 2013, over five (5) years prior.

89. On July 5, 2018, Plaintiff, as she had done numerous times in the past, submitted a vacation form to Defendant.

90. For the first time in her employment, Plaintiff received correspondence from Holly G. Durkes in early July 2018, informing Plaintiff that she was not allowed to take vacation if it overlapped with James "Buddy" Fountain's vacation request. Plaintiff submitted a subsequent email on July 17, 2018, informing Holly G. Durkes that, out of Plaintiff's ten (10) years of employment with PAI, this was the first and only time she had been told that her request would not be approved. Both Plaintiff and James "Buddy" Fountain had requested time off at least thirty (30) days in advance in compliance with PAI company policy.

91. As a result of Plaintiff's vacation request, Holly G. Durkes issued her a "formal warning" via email on July 30, 2018. This is the first reprimand, of any kind whatsoever, that Plaintiff received during her employment with PAI.

92. On July 11, 2018, Defendant removed Plaintiff's responsibility for "PFQ Forms" without notification thereof or justification therefore. Prior to July 11, 2018, Plaintiff had been charged with completing PFQ forms throughout her extensive employment with Defendant.

93. Following PAI's receipt of Plaintiff's EEOC Charge, Plaintiff was prohibited from signing off on Contract Labor Agreements.

94. In July 2018, Plaintiff submitted an anonymous complaint to the Department of Labor, stating that the company had failed to compensate several employees their overtimes wages due.

95. On July 17, 2018, Plaintiff was informed that, during the Safety Meeting, Brad Durkes announced the DOT Audit to the entire North Region. Durkes identified the person who called in the complainant as "still employed", explaining that management knew who had called in the report. Durkes also stated that "this person" had caused the company a lot of money and that, as such, the employee was taking money out of every employee's pocket.

96. On July 24, 2018, Holly G. Durkes informed Plaintiff that, moving forward, she (Holly) would be approving any and all vacation requested submitted by the Human Resources team moving forward. This task had been historically assigned to and completed by Plaintiff.

97. On July 31, 2018, Plaintiff directed email correspondence to both Adam Guinn and Holly G. Durkes about whether she retained authority to sign off on vacation requests for Safety, rather than HR, personnel. At no time did Plaintiff receive a response from either Adam Guinn or Holly G.

98. On August 1, 2018, Plaintiff's administrator access was removed from the Smart Videos Administrator Access. This prevents Plaintiff from performing her Risk Management job duties.

99. Consistently throughout August 2018, Plaintiff attempted to complete her duties regarding the company's Health Insurance Open Enrollment. This responsibility had been Plaintiff's throughout the duration of her employment with PAI. Despite Plaintiff's numerous calls and texts to Adam Guinn and/or Holly G., both individuals overtly refused to respond. Ultimately, Adam Guinn and/or Holly G. deliberately precluded

Plaintiff from completing her typically assigned job duties, and they eventually responded to Winona Menard, not Plaintiff, that the rates had been approved.

100.     In September 2018, Defendant, through Holly G., terminated Plaintiff's authority to obtain a Sam's membership for company functions.

101.     In September 2018, Plaintiff was not invited to a Managers meeting, which Plaintiff had always attended in the past. Instead, PAI invited James "Buddy" Fountain, who is not a manager.

102.     On September 4, 2018, Plaintiff was excluded from a Human Resources Department meeting regarding the New Hire Protocol and processes.

103.     On October 5, 2018, Holly G. directed an email to Plaintiff stating that PAI was coming to retrieve her company vehicle, as well as her fuel and maintenance card. Holly G. did not inform Plaintiff when someone would stop by her house and retrieve the property.

104.     Shortly thereafter, on October 18, 2018, Plaintiff received a call from Bobby Gradney, informing Plaintiff that he had been instructed to come to her house and retrieve her company vehicle, fuel card, maintenance card, and keys to the PAI facilities. Mr. Gradney proceeded to travel to Plaintiff's home and retrieve those items.

105.     In December 2018, Angelle resigned from his position with PAI.

106.     Almost immediately thereafter, Adam Guinn contacted Plaintiff and apologized to her for not taking her concerns about him more seriously.

107.     On February 8, 2019, Plaintiff took a leave of absence. Holly G. Durkes sent an email to all employees directing them to not contact Plaintiff for anything work-related and to forward any documentation to the otherwise relevant personnel.

108.     The EEOC issued a Notice of Suit Rights on February 7, 2019. *See* Exhibit B.

Plaintiff files her complaint within ninety (90) days of her receipt of Suit Rights,

rendering her complaint timely for purposes of bringing Title VII claims.

---

**FIRST CAUSE OF ACTION:**
**HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX/SEXUAL HARASSMENT**
*42 U.S.C. § 2000e et seq.*

---

109.     Plaintiff incorporates and reinstates each of the above paragraphs as if fully set

forth herein.

110.     Plaintiff is a woman, and, as such, is a member of a protected class.

111.     Plaintiff was subjected to sexual harassment in the form of pervasive, sexually

discriminatory ridicule, insults, and rumors that Plaintiff was engaging in sexual

improprieties with numerous male co-workers.

112.     The conduct complained of is based on Plaintiff's sex. But for Plaintiff's status as

a female, Angelle would not have engaged in accusing her of sleeping with several male

employees. At no time did Angelle forge false rumors about male employees sleeping

with other employees, especially during a meeting or luncheon.

113.     The sexually discriminatory ridicule and insults were so pervasive that it altered

the conditions of Plaintiff's employment and created an abusive atmosphere. Angelle's

repetitive rumors of sexual improprieties created a tense and hostile environment, which

forged excessive tension between Plaintiff and Angelle. The tension between these

individuals was well known to PAI management and acknowledged by the CEO, Adam

Guinn, on numerous occasions.

114.        Upon information and belief, these rumors were circulated in an effort to discriminate against her on the basis of her sex. Ultimately, after being demoted to a purely Human Resources position, Plaintiff was informed by Defendant that, "she was a woman in a man's world" and that women were better off in office jobs.

115.        Although PAI was made aware of the hostile work environment promulgated by Angelle through Plaintiff's verbal complaints to Adam Guinn on numerous occasions. Despite Plaintiff's repeated requests for help, PAI took no remedial action to stop the hostile environment and to prevent this type of unlawful activity from occurring.

116.        PAI, through its agents and officers, knowingly, and intentionally allowed the hostile work environment to exist.

117.        On one occasion, and after Adam Guinn consistently failed and/or refused to speak to Angelle on her behalf, Plaintiff had finally had enough and attempted to speak to Angelle personally about her concerns. Almost immediately thereafter, Angelle submitted a formal complaint against the HR Department, including Plaintiff, in an effort to paint her as the problematic employee.

118.        PAI, by its overt act or failure to act herein, supported the ongoing hostile work environment.

119.        Wherefore Plaintiff asks this Honorable Court to find Defendant, PAI, liable for creation of a hostile work environment based on Plaintiff's race, sex, and engagement in protected opposition activity in violation of Title VII of the Civil Rights Act of 1964.

---

**SECOND CAUSE OF ACTION:**
**GENDER DISCRIMINATION IN EMPLOYMENT**
*42 U.S.C. § 2000e et seq.*

---

120.	Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

121.	Plaintiff is a woman, and, as such, is a member of a protected class.

122.	Plaintiff was imminently qualified for her position as Human Resources Manager and Safety Manager. Plaintiff has successfully fulfilled her duties in such a role for nearly ten (10) years.

123.	As noted by Adam Guinn on numerous occasions, Plaintiff was a woman "working in a man's world."

124.	Ultimately, Plaintiff was demoted from the Human Resources Manager and Safety Manager to a purely Human Resources position because Adam Guinn felt that the Safety Manager needed to be a man because only men are taken seriously in the field.

125.	Plaintiff was replaced as Safety Manager by Michael Lietz, a male individual who is outside the protected class. Furthermore, every individual who has since held the position of Safety Manager has been a male.

126.	Even when Michael Lietz resigned and the Safety Manager position re-opened, Adam Guinn precluded Plaintiff from applying to or otherwise being considered for the position, inviting only the "gentlemen" in the room to apply.

127.	Wherefore Plaintiff asks this Honorable Court to find Defendant, PAI, liable for creation of a hostile work environment based on Plaintiff's race, sex, and engagement in protected opposition activity in violation of Title VII of the Civil Rights Act of 1964.

---

## THIRD CAUSE OF ACTION:
## RETALIATION
*Pursuant to 42 U.S.C. § 2000e-3(a)*

---

128.     Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

129.     Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

130.     On numerous occasions, Plaintiff verbally noted her concern and disgust for the pervasive use of racially derogatory slurs throughout the PAI workplace, namely the incessant use of and reference to "N*****s" by upper PAI management. Even further, when Holly G. and Brad Durkes refused to cease their use of such racially derogatory language and conduct, Plaintiff addressed her concerns with Adam Guinn, Defendant's CEO.

131.     Plaintiff reasonably believed that the consistent, pervasive, and daily use of racially derogatory language constitutes illegal activity under Title VII.

132.     Plaintiff advised Defendant, through its CEO, Adam Guinn, of what she reasonably believed to constitute illegal, discriminatory activity exhibited by Jamie Angelle, Holly G., Brad Durkes and other agents and/or employees on various occasions. Plaintiff made frequent attempts to address her concerns of a racially and sexually hostile work environment, in addition to ongoing sexual harassment, directly to Jamie Angelle, to Holly G. Durkes, and to Adam Guinn. Rather than disciplining individuals who acted in a discriminatory manner, Adam Guinn demoted Plaintiff and otherwise depleted her authority throughout the office. Furthermore, upon Plaintiff's demotion, a male filled the

Safety Director position to which she had been deprived. Adam Guinn stated that a man needed to be in that role because he would garner more respect out in the field.

133.    Additionally, when Plaintiff attempted to go up the chain of command and speak directly to Andrew Guinn, Sr. about the discriminatory activity, she was threatened and told that she "better f****** not," or that she would make things worse.

134.    Plaintiff's consistent opposition to what she perceived to be workplace discrimination on the basis of race and sex constitutes protected activity pursuant to Title VII.

135.    Ultimately, due to the repeated failure of the Defendant to address her concerns, Plaintiff contacted the EEOC and filed a Charge of Discrimination (Charge No. 461-2018-01409). This constitutes participation activity for purposes of Title VII.

136.    Even then, Defendant refused to act. Instead, Defendant began revoking or otherwise removing Plaintiff's administrative, managerial, and authoritative job duties, all of which she had been assigned for the previous ten (10) years of employment.

137.    Plaintiff was also demoted to a solely Human Resources position, so that Adam Guinn could fill the Safety Manager position previously held by Plaintiff with a male, whom he believed would garner respect of the field workers because "women only belong in office jobs."

138.    On one occasion, Holly G. attempted to formally reprimand Plaintiff for requesting vacation time that overlapped with another employee. Plaintiff and other human resources employees had taken concurrent vacation numerous times in the past, and at no time prior was it an issue.

139.     Defendant, through its agents and/or employees, began disregarding Plaintiff's authorities and job duties, entirely ignoring her requests for pertinent Human Resources information that made it nearly impossible for her to perform her duties as a Human Resources Manager with any degree of satisfaction.

140.     Ultimately, due to the recurrent attempts by Defendant, through its agents and employees, to undermine or otherwise circumvent Plaintiff so as to render her role meaningless, Plaintiff began experiencing severe panic and anxiety attacks, which ultimately prompted her to take a medical leave of absence beginning on February 8, 2019.

141.     As set forth above, Defendant, PAI, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the terms, conditions, and privileges of her employment in retaliation for her opposing what she believed to be unlawful conduct on various occasions.

142.     Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a) by unlawfully retaliating against Plaintiff after she: 1) lodged complaints opposing workplace discrimination and 2) filed a formal Charge of the Discrimination with the EEOC.

143.     Defendant's retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

144.     As a result of Defendant's discriminatory conduct, Plaintiff requested and was approved for FMLA leave, which began on February 8, 2019.

145.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience,

mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

146.    After Plaintiff filed his EEOC charge, Defendant continued to threaten, harass, and create a hostile work environment for Plaintiff. She eventually had no choice but to take leave from her employment with Defendant.

147.    Defendant, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the terms, conditions, and privileges of her employment in retaliation for her opposing what she believed to be unlawful conduct on various occasions.

148.    By retaliating against Plaintiff in response to her EEOC charge, Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a).

149.    Wherefore Plaintiff asks this Honorable Court to find Defendant, PAI, liable for the violation of 42 U.S.C. § 2000e-3(a).

---

**FOURTH CAUSE OF ACTION:**
**EQUAL PAY ACT**
*Pursuant to 29 U.S.C. § 216(b)*

---

150.    Plaintiff repeats and alleges all previous paragraphs as though fully set forth herein.

151.    Plaintiff is an individual currently employed as a Human Resources Director by PAI, a company that, at all times relevant to this suit, engaged in the production of goods and services for commerce.

152.     PAI is an employer subject to the Equal Pay Act, 29 U.S.C. § 206(d), because it is an enterprise engaged in commerce or in the production of goods for commerce and has employees engaged in commerce or in the production of goods for commerce;

153.     Defendant has, since the date on which the violations began, repeatedly and willfully violated section 6(d) of the Equal Pay Act, which are the equal pay provisions of the Fair Labor Standards Act. Defendant has paid higher wages to male employees in the same establishment for work on jobs, the performance of which requires equal, and, in fact, lesser, skill, effort and responsibility, and which are performed under similar working conditions.

154.     Defendant also discriminatorily awarded employee bonuses. For example, Jamie Angelle, who had a salary of $95,000.00, received a $125,000.00 bonus after managing seven (7) Ready Mix Plant locations. Plaintiff was responsible for the Human Resources, Safety, Training, Payroll, Risk Management divisions of all thirty-three (33) locations, responsible for "Village Sand," which is a sand pit owned by PAI, performed consulting work for Adam Guinn's business, "Southwest Materials," and performed consulting work for Andrew Guinn, Jr.'s company, "Trico." Despite the clear discrepancy in job duties, Plaintiff received a bonus of just $7,500.00 in 2017 and $500.00 in 2018.

155.     Mike Trahan, who had little to no safety experience, received a raise to $65,000.00 on January 1, 2019.

156.     Upon a rehire, Phillip Green, an individual hired to dispatch ready mix drivers and schedules concrete pours, earns a equal to annual salary than Plaintiff, the long-standing Human Resources Manager. As of August 23, 2018, Mr. Green's salary was $65,000.00 per year. He was also afforded two weeks' vacation with the option to gain a

third after a 6-month evaluation. As such, an employee with less experience and less job responsibility than Plaintiff was afforded a salary equal thereto.

157.    Defendant's conduct was actuated by ill will, recklessness, willful disregard of Plaintiff's rights, wantonness, oppressiveness, maliciousness, and in the spirit of mischief.

158.    Defendant's willful conduct is further illustrated by the fact that male employees in less senior positions to that of Plaintiff were also paid equal or higher salaries than Plaintiff. Defendant knowingly and willingly engaged in these discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights within the meaning of § 102(b)(1) of the Civil Rights Act of 1991, as amended.

159.    At all relevant times, Plaintiff had been meeting her employer's expectations. This is evidenced by the multiple, performance-based raises offered to her throughout the duration of her employment.

160.    Despite Plaintiff's extensive qualifications and abilities, PAI, through its agents and officers, knowingly and intentionally paid Plaintiff less than her male co-workers, solely because of her gender. Further, even male workers in inferior positions to that of Plaintiff were paid higher salaries than Plaintiff.

161.    Plaintiff is entitled to full back pay and compensatory damage in an amount to be determined by the jury.

162.    The aforementioned discrimination is intentional or taken in reckless disregard for Plaintiff's rights. Punitive damages in an amount to be determined by the jury should be awarded to punish Defendant and deter it and others from acting in a similar manner in the future

## FIFTH CAUSE OF ACTION:
## RESPONDEAT SUPERIOR
### *Pursuant to La. Civ Code art. 2320*

163.    Plaintiff repeats and alleges all previous paragraphs as though fully set forth herein.

164.    The acts of Plaintiff's supervisors, managers, and co-workers were performed while the actors were within the course and scope of their employment with PAI.

165.    The conduct of Plaintiff's supervisors, managers, and co-workers as outlined herein was approved by Defendant, as Defendant took no steps to change, alter, stop, or modify said conduct.

166.    At the time of the conduct, Plaintiff's supervisors and managers were acting on Defendant's behalf.

167.    After the events complained of, Defendant was made aware of Plaintiff's supervisor's acts, and approved them by its continuous failure to act.

168.    Therefore, Defendant PAI is liable for the acts of Plaintiff's supervisors and managers as outlined herein.

## PRAYER

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b)  Punitive damages;

(c)  Reasonable attorney's fees, with conditional awards in the event of appeal;

(d)  Pre-judgment interest at the highest rate permitted by law;

(e)  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(f)  Costs, including expert fees;

(g)  Reasonable and necessary medical care and expenses in the past and future;

(h)  Mental anguish damages in the past and future;

(i)  Injunctive relief; and

(j)  Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

## DEMAND FOR JURY TRIAL

---

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

**Respectfully Submitted**,

**SUDDUTH & ASSOCIATES, LLC**
Attorneys-at-Law
1109 Pithon St.
Lake Charles, Louisiana 70601
Telephone: (337) 480- 0101
Facsimile: (337) 419- 0507
E-mail: james@saa.legal

**BY:** **_/s/ James E. Sudduth, III_____**
**JAMES E. SUDDUTH, III, #35340**
**KOURTNEY L. KECH, #37745**
**ERIN N. ABRAMS, #38119**
*Counsel for Jeanea M. Thibodeaux*